Stephen J. Obie v. Commodity Futures Trading et al. Mr. Delacortes, whenever you're ready. Good morning, Your Honors. May it please the Court, I'm John Delacortes of the law firm of Emmett, Marvin & Martin LLP, on behalf of the plaintiff Stephen J. Obie. This case challenges the legality of a 2023 CFTC gag order, which, as applied to my client, barred him from praying with, speaking with, or associating with the CFTC's inspector general, his boss and his friend, Mr. Lalic. For me, at the beginning, this was on 12b-6, a motion to dismiss, rather than a summary judgment. Is that right? That's exactly correct, Your Honor. And therefore, we would argue that, pursuant to the Court's decision in Chamberlain and in Sabir, that we are entitled to all inferences, and that only in the most rare cases should an immunity determination be made at a 12b-6 level, and that our allegations should be credited. And our allegations here is that there was not a good motive to do this. There was not a compelling government interest. This was actually designed by persons under investigation, by the watchdog of the CFTC, to frustrate those investigations and to oust them, even though they didn't have the requisite votes. That's the allegation. We believe it's plausible. I have a question here. Sure. Didn't, at some point, the defendant agree that Obie and Vanek, or whatever his name was, could pray together? That's correct, Your Honor, 17 days later. 17 days later. Yes. Now, what are you asking for in between? Nominal damages? There would be, yes. There would be financial damages. Financial damages. Under the RFRA, pursuant to the Tanveer decision of the U.S. Supreme Court, there are money damages. Are you going to do the nature of a fine, or, I mean, like a statutory amount, or would it be an actual showing of monetary loss, essentially? I believe we would have to prove our case, including monetary damages, and I believe we're capable of doing that, Your Honor. Monetary damages? Yes. I just am troubled with the concept here. Well, we can explain. How do you find that? Well, we think it's beyond the scope of the case below. If you want to remand us, we'll do it, but I'm happy to explain, Your Honor. The damages part of this, and then I'm seeing a declaratory judgment part of it. Yes. And the declaratory judgment part of it, your adversary says, well, that's out because that would have to be, it doesn't have to be capable of repetition. Yes. The facts are so unusual that you don't have standing. Yes. So we recognized when we got the motion dismissed, it was making a lot of factual arguments, and so in addition to the motion dismissed, in addition to the complaint, which alleges that we have financial damages, we provided a declaration to further flesh it out, and in the declaration, it describes what the harm was to my client. So my client, in order to vindicate his rights, in order to get the right to pray, he had to hire a lawyer, myself. He had to file a, draft a complaint, file a complaint, draft TRO papers, file those TRO papers, get assigned a judge, get a hearing date, have an argument on it, have my counterpart, Mr. Liss, argue that too bad, so sad, he's not entitled to pray, have the judge strongly encourage them.  I understand there's a lot for the lawyer to do here.  So it's not just a matter of legal fees, although there is a legal fee entitlement there. Yeah. But my client, in the process, permanently antagonized himself with the CFTC. My client, prior to rejoining the CFTC as a private lawyer, his nature of his practice is such that he would be advising people before the CFTC. He has now permanently damaged any career prospects he's had, and he did it to vindicate his rights, and he never should have had to do that. He never should have had to bear that cost in order just to get the right to pray. Can I just go back a little bit to the question of qualified immunity? Sure. And the idea of accepting, you know, the allegations as made, that the defendants here would have known that by imposing a gag order, a not religion-specific gag order, but essentially a gag order, a general wholesale gag order on one individual, that they are infringing on the religious rights of a separate individual. Mm-hmm. What is the support that that the circumstances of this case, it would have been clear to them that this was a problem, that there was a right that was being infringed here? Sure. So, Judge Lee, we would break up that answer into two parts. The first part is at the outset. When you make a blanket ban on communication, that's necessarily going to sweep in all religious, all First Amendment communications, religious First Amendment. But the ban was not against your client, right? It was not. It was not. They didn't tell him that he couldn't communicate. So I guess that's the first part. It was by nature. I'm sorry. I didn't mean to interrupt. It takes two to tango. And as Mr. List conceded at the hearing, they could not engage in a joint prayer by nature. The inspector general could not have even said amen at the end to a prayer directed. Now, Mr. List said at the argument that my client could have written the prayer in a letter, put a first-class stamp on it, and mailed it to him. So we believe that –  Going back to – Sure. Sure. Sorry, Your Honor. I got off on a tangent. No, no. That's all right. I'm here to bring you back there just to make sure you get to this point, though. The idea that it is clearly established that by imposing a gag order that does not – in the first instance, does not talk about religion. It just says essentially don't talk with anyone in this organization. Yes. That it would have been known that by doing that, you are infringing on the religious rights of all the people in that organization who the person who is the target of this gag order cannot talk to. So two answers, Your Honor. First, we believe it was known from the outset. The defendants here are three of the most high-ranking government officials. They're all lawyers. Two of the three teach law school. They should have been aware that when you make a blanket ban on communications, it will sweep up First Amendment-protected communications. So Judge Walker, before I answer your question, if I could just answer the second part of Judge Lee's question. So even if they were not initially aware, on May 29th, we served a complaint on the general counsel of the CFTC outlining in chapter and verse that my client wanted to pray, that he was barred from praying. And we asked them, let us – let us pray. And once, twice, three times, they stood by their rejection. After we had the tiara, they – first the general counsel said, no, he would not consent. Then we went to a hearing, and Mr. List said he wouldn't consent. And then after the hearing, Mr. List said, again, he wouldn't consent. So even after it was explained on May 29th through a detailed complaint, through detailed motion papers, that this blanket ban had swept in constitutionally protected, RFRA-protected, faith-based communications, they doubled down and tripled down and quadrupled down and said, no, you cannot pray. Now, answering your question, the standard is, do you have a compelling government interest and are you using the least restrictive means possible for that interest? We do not allegedly have a compelling government interest here. There was no compelling government interest to stop these two men from communicating in their private time on non-CFTC matters, off-site, off-duty. The CFTC has no right to do that. They're a securities regulator. You're not making a religious objection on that score. You're just saying that a gag order was inappropriate because that would inhibit all the free speech that occurred. Yes. And it sweeps in necessarily. And it sweeps in anybody who could speak to this person or might engage with the person would therefore be covered by the gag order. Yes. Even though it never specified third party. That's correct. So that's the test. The test is a compelling government interest in the least restrictive means possible. That's the test for an RFRA violation. The test for qualified immunity is, is there a clearly established right? And the clearly established right was, if we look at the Sabir case, in the Sabir case, they said there was, Your Honor said, there was a clearly established right in 2017 for corrections officers to know not to interfere with people's prayer rights. Now, the correction officers in 2017 didn't have the Sabir decision, right? The commissioners of the CFTC, whether they're judged by the same standard as the correction officers or a higher standard because they teach law at universities, they had the Sabir decision. But isn't that a fairly distinct situation? It's one thing when parties are saying we are not going to allow this religious activity and that that's part of what is being prohibited versus we're not going to allow communicative activity and yes, religious components are swept up in that. I think that's a different, in terms of the knowledge of the defendants in a particular case, if what's at issue is a specific prohibition or rule that relates to religion, then yes, that's different than this is about communication and religion is caught up in it. Maybe at the issuance, Your Honor. But when we provided them a copy of the complaint and they said you still can't pray and then we made a tear-up motion and we're before Judge Okun and Mr. List said you still can't pray and then after Judge Okun said I really need you to go back and rethink that and the next day Mr. List writes a letter to Judge Okun and says they still can't pray and he says the reason is because the prayer would be difficult to police at best. At that time they're on notice. What's their excuse at that point? They don't have any excuse. They've been put on notice. They understand what the impact of this is. And the Religious Freedom Restoration Act, in the findings at the opening, Congress says that religiously neutral acts can interfere with the exercise of religion as much as purposeful acts. That's the findings. That was the whole purpose of the RFRA was to capture exactly situations like this. That's expressly in the findings of the RFRA. That's why we're here. The Supreme Court has said the RFRA expands beyond the First Amendment and gives even greater protection because the Congress was upset that the Supreme Court had narrowly restricted the rights of freedom of faith. And so that's the statute we're moving under. And on a 12b6 motion to dismiss, which, again, in Sabir, the court noted that if you decide as a tactical measure to go on a 12b6 motion to dismiss and make your immunity application at that stage, you're stuck with what's in the complaint. So we allege in the complaint that this was done with an ulterior motive, with a wrongful motive. Our belief was that it was intended to do exactly what it did, which is to squeeze an 86-year-old man out of his support structure and force him out of office, including by stopping him from speaking with friends and confidants and co-workers. And that's the allegation. And we're entitled to inferences from this. My client is the former director of enforcement at the CFTC. These are not wild and crazy allegations here. He's been granted awards for his service. He's made a credible allegation. The law says he's entitled to have those allegations heard and considered. Can I just ask you? I'm sorry, what? You came to a nice conclusion there, but I just have one question. Sure, sure. That you said in terms of the allegations regarding not your client, I guess. What are we to make of those? Like, what is the relevance of the fact that, you know, the intentional behavior, and you talked about, you know, 86-year-old men and all that. That's not your client. So as specified in the complaint, both my client and Mr. Lavik were part of a statutorily created independent component of the CFTC called the Inspector General. A lot of government agencies have these Inspector Generals. And their job is to root out waste, fraud, and abuse from the main agency. And as set forth therein, they were conducting investigations into waste, fraud, and abuse, including some of the commissioners, at the time that this was done. And the Inspector General, rightly or wrongly, the allegations against him were before my client joined the agency, so I can't speak to those allegations. But there was a leaked campaign, leaked in the Wall Street Journal, to force him out. And it's our allegation that this was done purposefully and for a bad motive. The bad motive was to force his out, so notwithstanding that they didn't have the congressionally mandated votes to remove the Inspector General, and it was to frustrate ongoing investigations. And my client and the Inspector General are the two people in the agency with independent investigative authority. So if you stop them from communicating, you frustrate an investigation. So that's our belief as to, that's what we allege. Those allegations are entitled to all inferences that are in favor. And if accepted as true, there's clearly no inference, can be no inference of immunity here. All right. Thank you. Thank you, Your Honors. May it please the Court. My name is Jeremy List. I'm an assistant U.S. attorney representing the defendants at Appelese. I'd like to pick up on some of the questioning that the Court just had about notice and knowledge and its relevance in the qualified immunity context. So in Tanvir v. Tanzen, this Court recently held that qualified immunity applies when a reasonable person in a government official's position would not have known that their actions would potentially burden a plaintiff's religious exercise. And here, Petitioner has not alleged facts suggesting that a reasonable person in the Commissioner's position would have been aware of the fact that they were by issuing the confidentiality directive imposing on Mr. Obey's religious exercise. As the Court noted, the directive was not actually issued to Mr. Obey. The directive was also religiously neutral. It didn't mention religion. And though Mr. Obey has alleged various possible motives for it, none of them are about religious exercise and about specifically trying to burden religious exercise. And in addition, the Commissioners were not unnoticed that either Mr. Obey or Mr. Lavik were religious or were interested specifically in praying with one another. And, you know, the record also shows that once this lawsuit was filed, the Commissioners moved swiftly to allow them to pray together. Well, that's a port of contention. Seventeen days is swift. So I think the timeline should be broken up into pieces. So the original confidentiality directive was issued on May 16th. And for the next 12 days, there's no allegation that the Commissioners were ever put on notice that there was any religious burden in place. And for that, I would direct you to pages A82 and 83 in the record. Then the lawsuit is filed. And I encourage the Court to read the complaint carefully and particularly look at A20 in the record there. And that's where Mr. Obey in his complaint describes what he wants to do. And he does not say there that he wants to pray jointly with Mr. Lavik. He says that he wants to offer prayer in support of Mr. Lavik and say that he wants to light a candle and candle for him. It's not until the complaint was amended several months later that Mr. Obey actually said in his complaint that I want to pray with Mr. Lavik. So even when the complaint was filed and sent to CFTC counsel, it was not clear that he wanted to pray with Mr. Lavik. And as the government noted at the TRO hearing, from the CFTC's perspective, Mr. Obey was already capable under the directive of telling Mr. Lavik that he was praying for him and offer his support and say I'm going to light a candle for you. So the first time that Mr. Obey actually said I want to pray with Mr. Lavik was when he filed his TRO motion a couple days later. Now we're talking, I believe, May 30th. And on May 31st, we have the TRO hearing. And what the government argues there is that, first of all, Mr. Obey is free to send any message or prayer that he wants to Mr. Lavik. We acknowledge that the directive was worded broadly enough that if Mr. Lavik were to comply with it, he would not be able to pray with Mr. Obey. But we said there was no indication that Mr. Lavik wants to pray with Mr. Obey. And we also said that the CFTC was willing to look into making an accommodation. And then right after the hearing, the same day, the court the government put in a letter saying that it was working on trying to come up with an accommodation. And in fact, within a couple of days, within two days, the CFTC filed a notice with the court saying, hey, these two can pray together. We're not going to interpret the directive to prevent that. So the timeline here is very, very short. And it's even shorter if you look from the point at which the CFTC would be. Kennedy, what are we supposed to conclude from your description of the timeline? So we should be the court should conclude that, first of all, the CFTC commissioners were not on notice about the desire, about the impact of the directive on religious exercise until very late in the game, in the 17-day period. And once they became aware of it, they worked quickly to allow the two of them to pray together. Shall I be disturbed, your answer is no. But shall I be disturbed by the fact that we're doing this at the early pleading stage rather than at the summary judgment stage? No, I don't think so, Your Honor. All of this is evident from the complaint itself and from the record that's before the court already. As this Court noted in Tanvir, when a qualified immunity defense is visible on the face of the amended of the complaint, it's appropriate for the court to grant qualified immunity. Unless there are further questions about the RFRA claim, I would like also to address the declaratory judgment claim. So, first of all, the Petitioner lacks standing to assert this declaratory judgment claim. Mr. Lavik has retired from the CFTC. Mr. Obey himself has retired from the CFTC. And what, you know, counsel for Mr. Obey directed the Court to Mr. Obey's declaration with respect to standing. And I would encourage the Court to look at it. This is page 80209 of the record. And what he says is, I'm quoting here, if the CFTC cleans up its act, ends its culture of retaliation, and stops trying to ban prayer, I will consider a return. He's not even saying that at that point he would actually return. He was saying, I will consider a return. This is a highly speculative injury in fact here. And Mr. Obey has not met his burden to show he has standing. The additional issue with the declaratory judgment claim is that there's no such thing as a cause of action freestanding for declaratory judgment. And that was another – declaratory judgment is a remedy, not a cause of action. Unless the Court has any further questions, the Government is prepared to rest on its papers. All right. Thank you, Mr. Lewis. Very briefly, if I have one minute. I now recall, I apologize, I never answered Judge Walker's question. We are also seeking declaratory relief. The case law says if post-filing actions do not move a cause of action as long as the plaintiff remains or retains some minimal interest in the outcome of the litigation, we believe we've established that here. You may wish to rejoin. As far as two days versus 17 days, we don't believe there's any two-day exception to the RFRA. The case law says if you deny someone the right to pray even once, that's a violation of the RFRA. There's no de minimis clause. As far as what was known, I just want to very quickly quote from A92 of the transcript. This was Mr. Liss at the TRO hearing. Judge Okin asks – Somehow – I'm sorry. I've done questioning your understanding of the law, but the notion that there is no de minimis protection anytime, anywhere strikes me a little strange. I mean, if somebody says something about you should pray and then two hours later comes back and says, my God, I shouldn't have said that to you, do they have to pay for your legal fees? Your Honor, I can't speak to that hypothetical. There may be. That's not what happened here. What happened here is we had to go file and get a – seek a TRO. And after the TRO hearing, Mr. Liss wrote – this is page 851 of the transcript – Quote, Plaintiff's request that the Court grant his TRO to the extent of allowing Plaintiff and the Inspector General to engage in communications that do not implicate confidential CFTC matters is ambiguous and difficult to police at best. A court-sanctioned directive that the Inspector General is free to engage in any such ill-defined interaction could subvert the agency's legitimate purpose in restricting the Inspector General's communication with the courts. This is page 851. This is the letter that Mr. Liss wrote to court after the TRO hearing. So after the CFTC has the benefit of the Department of Justice and the great lawyers at the Southern District of New York, and after there's a hearing and after Judge Okun weighs in on his at least preliminary views, and after they – and he – and Judge Okun says, go back and think about this, they went back and thought about this, and the position of the CFTC was, sorry, we can't police people's prayers. Now, frankly, we view it as outrageous that the CFTC thinks it has the right to police people's prayers. They absolutely do not. And so for those reasons, we would ask that the decision be reversed. Thank you. I have a question. Sorry. Still here. It's Judge Etkin. I'm sorry? Doesn't Judge Okun pronounce his name Etkin? You may. I apologize. I apologize to Judge Etkin. I don't know what – when you put an O and E together, it's not something I know what to do with. I'm sorry. Thank you. Thank you both, and we'll take the case under advisement.